EFiled: Aug 01 2014 02:54PM EDT
Transaction ID 55822659
Case No. 5714-VCL

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

GORDON SCOTT LEVEY,  )
　　　　　　　　　　　　　　　　)
　　　　Plaintiff,　　　　　　　　　)
　　　　　　　　　　　　　　　　)
　　　　v.　　　　　　　　　　　　) 　C.A. No. 5714-VCL
　　　　　　　　　　　　　　　　)
BROWNSTONE ASSET　　　　)
MANAGEMENT, LP, BROWNSTONE )
INVESTMENT PARTNERS, LLC,　)
PINEBANK INVESTMENT　　　)
PARTNERS, LLC, PINEBANK ASSET )
MANAGEMENT, LP, DOUGLAS　)
LOWEY, OREN COHEN, and　　)
BARRETT NAYLOR,　　　　　)
　　　　　　　　　　　　　　　　)
　　　　Defendants.　　　　　　　)

### MEMORANDUM OPINION

Date Submitted: June 5, 2014
Date Decided: August 1, 2014

James S. Green, Sr., Jared T. Green, SEITZ, VAN OGTROP & GREEN, P.A., Wilmington, Delaware; David T. Shulick, SHULICK LAW OFFICES, Bala Cynwyd, Pennsylvania; *Attorneys for Plaintiff.*

Collins J. Seitz, Jr., David E. Ross, Eric D. Selden, SEITZ ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; *Attorneys for Defendants.*

**LASTER, Vice Chancellor.**

The plaintiff and the three individual defendants worked together as principals in a financial services boutique. On January 26, 2006, the plaintiff quit. He claims he resigned from his employment, but did not withdraw from certain entities through which the boutique operated. In this action, he seeks a declaration that he continues to own equity stakes in two of the entities—a limited liability company and a limited partnership. If he remains an owner, then he demands his *pro rata* share of all distributions made by those entities since January 2006, and he wants the defendants to account for any undisclosed profits.

The evidence at trial established the plaintiff withdrew from the two entities as of January 26, 2006. Under the applicable entity statutes, the plaintiff became entitled upon withdrawal to the fair value of his interests in the entities. There were no written agreements governing the entities at the time of the plaintiff's withdrawal, and this decision need not resolve the defendants' argument that an unwritten agreement limited the plaintiff to the value of his capital accounts. Because the plaintiff only presented evidence at trial sufficient for the court to determine the value of his capital accounts and did not present any evidence of the fair value of his interests, the most the plaintiff can receive is the value of his capital accounts. The convergence of the parties' positions renders unnecessary any ruling on the existence of an unwritten agreement.

This decision awards the plaintiff $35,042.67, representing the value of his capital accounts on the date of his withdrawal. Pre- and post-judgment interest is due on this amount at the legal rate, compounded quarterly, from January 26, 2006, until the date of payment.

1

## I.    FACTUAL BACKGROUND

The case was tried over three days.  The plaintiff and the three defendants testified live.  Each has a personal interest in the outcome of the litigation, and none gave wholly credible testimony.  This decision finds that the following facts were proven by a preponderance of the evidence.

### A.    The Broker/Dealer

The plaintiff, Gordon Levey, and two of the individual defendants, Douglas Lowey and Barrett Naylor, met while working at Mabon Nugent & Co., a New York investment firm.  Lowey traded bonds, Naylor sold bonds, and Levey provided technical support for the bond trading operation.  Because Levey and Lowey have similar names, this decision refers to Levey as Gordon.  The parties frequently used first names in their testimony, and no disrespect is intended.

In 1994, Lowey and Naylor moved to Bear Stearns.  There they met the third individual defendant, Oren Cohen, who was an analyst focusing on high-yield securities.

In 1997, Lowey decided to form a new firm that would specialize in trading high-yield bonds.  The firm eventually was named Brownstone Investment Group, LLC.  The parties refer to this non-party entity as "BIG," and they refer to the four defendant entities as "BIP," "BAM," "PIP," and "PAM."  For those immersed in the case, these terms trip poetically off the tongue.  For those less intimately involved, like the author of this decision and any readers other than the parties and their lawyers, the terms breed confusion. This decision refers to Brownstone Investment Group as the "Broker/Dealer." The other entities are introduced later.

Lowey testified that he initially formed the Broker/Dealer as a Delaware limited liability company, then talked to Naylor and Gordon about joining him. In 1998, they did. The three thought of themselves as partners. No one drafted formal documentation for the firm.

Lowey explained at trial that the partners did not prepare formal documentation because they were friends who trusted one another, and they prioritized their day-to-day jobs over the less compelling details of entity-level paperwork. Their informal approach largely continued until Gordon left and litigation ensued. Before then, what motivated the partners to prepare any type of documentation appears to have been the need to make tax filings or comply with regulatory requirements. When doing so, the partners treated their internal relationships as sufficiently malleable to enable them to achieve the most favorable economic result.

Everyone agrees that Naylor received a 20% equity interest in the Broker/Dealer and Gordon received a 10% equity interest. Lowey owned the rest.

**B.    The Hedge Fund**

In 2002, Cohen joined Trilogy Capital, LLC, where he managed a hedge fund. Lowey had kept in touch with Cohen, and in late 2003, Lowey and Cohen began discussing forming a hedge fund of their own.

In early 2004, Cohen left Trilogy and began working with Lowey to set up the new fund. Lowey and Cohen hired a law firm and a prime broker, worked with counsel to set up the necessary entities, and raised capital from investors.

The resulting fund structure involved three entities. First, there was Brownstone Partners Catalyst Fund, the actual hedge fund that owned securities and made trades. This decision refers to this entity as the "Hedge Fund." Second, there was Brownstone Investment Partners LLC, which the parties call "BIP." It technically managed the Hedge Fund and owned a 20% carried interest in the fund. To ensure that amounts generated by the carried interest would receive favorable tax treatment, it was essential that BIP remain passive and hire an active manager to do the actual managing. This decision therefore refers to BIP as the "Passive Manager." Third, there was Brownstone Asset Management, LP, which the parties call "BAM." It was the entity that the Passive Manager hired to do the active managing, so this decision refers to it as the "Active Manager." In return for its services, the Active Manager received a management fee from the Hedge Fund, payable quarterly in advance, equal to 1.5% of assets under management.

Lowey and Cohen decided to run the Hedge Fund out of the Broker/Dealer's offices. This plan enabled Lowey to split his time easily between the Broker/Dealer and the Hedge Fund, and it allowed the Hedge Fund to benefit from the Broker/Dealer's resources, including its trading relationships and technology infrastructure.

In the first quarter of 2004, Lowey decided that he needed to offer interests in the fund to Naylor and Gordon. Cohen resisted. After discussing matters, Lowey and Cohen agreed that Naylor and Gordon would each receive a 2.5% interest.

The 2.5% offer failed to inspire gratitude. Naylor compared it to his 20% interest in the Broker/Dealer and became upset with Lowey. Gordon did not like the idea of the

4

Hedge Fund in the first place. He was the Chief Compliance Officer for the Broker/Dealer, and he thought it was risky for a hedge fund and a broker/dealer to operate out of the same office through a single trader. Given that Lowey is a human with only one brain, Gordon worried that a regulator might think that Lowey had access in his capacity as the principal trader of the Hedge Fund to non-public information in his head about what he was trading in his capacity as the principal trader of the Broker/Dealer. Gordon proposed to limit his own involvement to the Broker/Dealer, and he countered that instead of giving him an interest in the new fund, Lowey should increase his share of the equity in the Broker/Dealer to 33%. According to Gordon, when Lowey first enticed Naylor and Gordon to join the Broker/Dealer, he promised them each one third of the business, but he later reneged and forced Naylor and Gordon to take less. Gordon told Lowey to give him what he believed he was originally promised.

Lowey went back to Cohen and told him they needed to sweeten their offer. After some tense discussions, Lowey and Cohen agreed that Naylor and Gordon would each receive a 5% interest.

At trial, the individual defendants testified that Lowey and Cohen extracted two agreements from Naylor and Gordon in return for their 5% stakes. First, they claimed that Naylor and Gordon had to perform work for the Hedge Fund and that to satisfy this requirement, Naylor helped market and raise capital for the fund, and Gordon became CFO and provided technical support. Second, they claimed that Naylor and Gordon agreed to forfeit their equity interests in the Passive Manager and the Active Manager if

5

they ever left the Broker/Dealer. Gordon disputed that there were any agreements regarding his interests in the Passive Manager and the Active Manager.

## C. Gordon Forgoes Income In The Active Manager For 2004.

In early 2005, as part of his administrative responsibilities, Gordon was working with Brownstone's accountant to prepare the various tax filings necessary for 2004. In March, the accountant provided Gordon with a draft tax return that allocated the Active Manager's net income according to the members' equity interests.

The accountant's proposed tax treatment, however straightforward, risked inviting regulatory scrutiny from the City of New York. Lowey, Naylor, and Gordon had structured their affairs at the Broker/Dealer so that only Lowey filed taxes with the City. Naylor and Gordon paid taxes on their respective shares of the income from the Broker/Dealer in the jurisdictions where they lived. If the Active Manager's net income were allocated as the accountant proposed, then each of its owners would receive a Schedule K-1 reflecting income generated in the City of New York. Gordon was concerned that Gotham tax authorities would question why he and Naylor were filing returns for one Brownstone entity in the City, but not other returns for similarly named entities.

To avoid attracting regulatory attention, Gordon proposed in an email that the Active Manager's net income for 2004 *not* be allocated in accordance with the members' equity interests, which the accountant confirmed was permissible. For the partners, the amounts were relatively small, and Gordon proposed to have all of the Active Manager's 2004 income allocated to Lowey, who was a resident of New York City and already

6

paying city taxes, and to Cohen, who was not a member of the Broker/Dealer. Lowey then would make it up to Naylor and Gordon by paying them slightly more through a different Brownstone entity. Gordon's email reflects that this was a one-time fix and that it would be necessary to address the issue in 2005. The Schedule K-1s reflect that the Active Manager's 2004 income was allocated to Lowey and Cohen, as Gordon suggested.

At trial, the defendants attempted to expand Gordon's effort at regulatory expediency into a decision to forfeit his interest in the Active Manager for no consideration. That testimony was not credible and does not reflect what happened.

**D.    Gordon Resigns.**

Gordon testified at trial that he became progressively more miserable at work and that he came to dislike his partners. He spent much of 2005 reflecting on his situation, and by December, he was thinking seriously about leaving.

On the morning of January 26, 2006, Gordon told Naylor that he was quitting. Naylor was shocked, and they spoke about Gordon's decision at some length.

When Lowey arrived at the Brownstone offices, he joined Naylor and Gordon. Gordon gave Lowey his resignation letter, which included a list of demands concerning the Broker/Dealer. The parties did not introduce the resignation letter into evidence, but the testimony indicates that Gordon demanded compensation in return for his equity interest. No one appears to have focused on the Passive Manager or the Active Manager.

To emphasize that he was done working at Brownstone, Gordon cut up his corporate charge card and building identification card. He also handed over his office keys. Lowey accepted that Gordon was leaving.

On Wall Street, security typically escorts a departing employee out of the building. For Gordon, Lowey gathered the Brownstone employees together and thanked Gordon for his service. Gordon said goodbye to and shook hands with each of the individual defendants, and everyone wished him well. Shortly after leaving, Gordon withdrew his personal investment in the Hedge Fund, and he was sent this amount.

Days after Gordon resigned, Lowey caused the Broker/Dealer to sue him in the United States District Court for the Southern District of New York (the "District Court Action"). The complaint contended that Gordon misappropriated trade secrets and sought an injunction to prevent Gordon from offering or disclosing Brownstone's trading software to competitors. On February 17, 2006, Gordon's counsel deposed Lowey in the District Court Action. In contrast to the certainty with which the defendants now maintain that Gordon was no longer a member of any of the Brownstone entities—including the Active Manager—after his departure on January 26, Lowey professed during his February 17 deposition not to know whether Gordon was still a member of the Active Manager. When asked by counsel to name the entity's members, Lowey responded, "Good question." *See* 1 Trial Tr. 110.

At some point after Lowey's deposition on February 17, 2006, the individual defendants appear to have decided that Gordon no longer was a member of the Broker/Dealer, the Passive Manager, or the Active Manager, because they stopped making any distributions to him. They also stopped providing him with information about the performance and profitability of the entities. On June 5, 2006, the defendants

8

reported in a Form ADV filing that Gordon was no longer a partner in the Active Manager.

The individual defendants also prepared a Schedule K-1 designed to show that Gordon no longer had any interest in the Passive Manager, but the principal role of the Schedule K-1 in this litigation has been to impeach the defendants' credibility. If Gordon relinquished his equity in the Brownstone entities as of January 26, 2006, then at the end of the 2006 tax year, he should have received Schedule K-1s for the Broker/Dealer, the Passive Manager, and the Active Manager covering the partial-year period from January 1 to January 26. None of the Brownstone entities sent Gordon a Schedule K-1 for the stub period in 2006.

After January 26, 2006, the only Schedule K-1 that Gordon received was from the Passive Manager, and it covered the period ending December 31, 2005. Although the individual defendants agree that Gordon remained a member of the Passive Manager after this date, the Schedule K-1 was marked "Final." Even more strange was how it depicted the evolution of Gordon's interest in the Passive Manager over the course of 2005. The Schedule K-1 listed Gordon's share of profits, losses, and capital at the beginning of the 2005 as 5.00%, consistent with what Gordon believes his interest to have been. As of December 31, 2005, however, it listed Gordon's share of profits and losses at 2.29% and his share of capital as "None." The individual defendants could not explain why Gordon's share of profits and losses declined during 2005. Nor could they explain why his share of year-end capital declined more than his share of profits and losses.

9

The Schedule K-1 for 2005 showed withdrawals and distributions of $13,289 for the year from Gordon's capital account. Gordon's beginning capital account in the Passive Manager was listed as $7,311, with $500 capital contributed during the year. His current year increase was listed as $5,478. Gordon's withdrawals in 2005 supposedly left an ending capital account balance of zero. At trial, Gordon testified that he had not received any withdrawals or distributions from the Passive Manager for 2005.

To prove otherwise, Lowey cited two checks that Gordon received in 2005, one for $3,284 dated April 1, 2005, and a second for $10,000 dated April 15, 2005. Leaving aside that the two checks add up to $13,284, not $13,289, Gordon testified credibly that the first check for $3,284 represented his share of the 2004 income for the Passive Manager. That figure matches the income listed in the supporting schedules to the 2004 Schedule K-1 Gordon previously received for the Passive Manager. The 2004 Schedule K-1 listed Gordon's end-of-year share of profit, loss, and capital as 5.00% and showed an ending capital account balance of $7,311, which corresponded to the beginning capital account balance on the 2005 Schedule K-1. Lowey issued the check for $3,284 to Gordon in April 2005 because, at that point, the members' correct year-end taxable income for 2004 had been determined as part of the tax preparation process for the tax year ended December 31, 2004. It was paid out of the Active Manager's checking account because the Passive Manager did not have a checkbook.

Gordon testified credibly that second check for $10,000 represented his 5% share of the $200,000 quarterly management fee that the Active Manager earned for managing

10

the Hedge Fund. A fee of this size would imply that the Hedge Fund had approximately $54 million in assets under management at the time, which is consistent with the record.

Sadly, the defendants appear to have manufactured an erroneous Schedule K-1 for the Passive Manager with the goal of reducing Gordon's capital account to zero at year end. To that end, they latched onto the only two checks they could find. Gordon's Schedule K-1 for 2005 should have shown him beginning the year and ending it with the same 5% figure for profits, losses, and capital.

### E.     Gordon Gives Written Notice Of His Withdrawal.

On January 25, 2007, the day before the one year anniversary of his resignation, Gordon gave written notice that he desired to withdraw from the Passive Manager and the Active Manager. He contended that upon withdrawal he was entitled to receive payment of his capital account and the cash value of his interests in the Passive Manager and the Active Manager.

The defendants offered a perplexing response. Rather than stating their belief that Gordon had withdrawn a year earlier, as they now maintain, their counsel sought "additional information in order to assess [Gordon's] 'demands.'" JX 28; *accord* JX 29. Their counsel then listed eleven different categories of information that he wanted Gordon to provide. These categories included (i) Gordon's basis for believing he was a partner, (ii) Gordon's basis for believing that, if he was a partner, he could withdraw from the entity, (iii) Gordon's basis for believing that he was entitled to payment of his capital account upon withdrawal, (iv) Gordon's basis for believing that he was entitled to the

11

cash value of his interest in the entities upon withdrawal, and (v) the valuation process Gordon believed should be used to calculate the value of his interests.

## F. Gordon Files An Arbitration Demand.

On February 28, 2007, Gordon filed a motion to stay the pending District Court Action and to compel the defendants to submit to arbitration before the National Association of Securities Dealers ("NASD"). The district court granted Gordon's motion on September 17 and closed the case.

On February 15, 2008, Gordon filed an arbitration demand before FINRA, the successor to NASD, against the Broker/Dealer, the Passive Manager, the Active Manager, Lowey, and Naylor. Among other claims, Gordon contended that he had withdrawn from the Broker/Dealer, the Passive Manager, and the Active Manager and that the defendants had failed to pay him the value of his equity interests in those entities.

The arbitration panel held that neither the Passive Manager nor the Active Manager was subject to FINRA jurisdiction. The panel dismissed both entities and adjudicated only Gordon's claim for the value of his interest in the Broker/Dealer.

During the arbitration, Gordon claimed that the fair market value of his interest was more than seven million dollars. In May 2009, however, the panel found that Gordon only was entitled to an amount that is consistent with the return of his capital account when he left the Broker/Dealer, plus interest. The panel did not explain the basis for its finding.

**G.    Gordon Files Suit In Delaware.**

The same month that the arbitration panel issued its decision, Barron's ranked the Hedge Fund as the 82nd best performing fund as a result of its strong returns over a three-year span. The article indicated that the Hedge Fund had $370 million in assets under management. In August 2010, Gordon filed this action in which he contends that he continues to own an equity interest in the Passive Manager and the Active Manager and that he is entitled to 5% of all past and future distributions from those entities.

This court dismissed Gordon's claims as barred by laches. On appeal, Delaware Supreme Court agreed that the "specific claims actually advanced by [Gordon] lack merit," but in an exercise of its independent review, the Delaware Supreme Court determined that the interests of justice required reversal and a remand for further proceedings. *Levey v. Brownstone Asset Mgmt., L.P.*, 76 A.3d 764, 766 (Del. 2013).

**H.    Lowey And Naylor Depart.**

In 2010, Lowey and Cohen decided to go their separate ways. To effectuate their separation, they agreed that Lowey would exit from the Passive Manager and the Active Manager. As compensation for Lowey's interest, they agreed that he would receive a three-year tail, meaning he would receive a certain percentage of distributions in the year he left and lesser percentages in each of the two following years. Naylor left at the same time and received the same treatment.

After Lowey and Naylor left, Cohen changed the names of the Passive Manager and the Active Manager to Pinebank Investment Partners, LLC, which the parties call "PIP," and Pinebank Asset Management, LP, which the parties call "PAM." Because

these entities were continuations of the Passive Manager and the Active Manager under different names, this decision does not refer to them separately.

## II. LEGAL ANALYSIS

Gordon seeks a declaration that he continues to hold a 5% interest in the Passive Manager and the Active Manager. If he remains an owner of those interests, then he demands his proportionate share of all past distributions made by those entities. He also seeks an order requiring defendants to identify any undisclosed profits, presumably so that he can receive his share of those.

The defendants contend that Gordon relinquished his interest in the Active Manager in 2005 and, in any event, withdrew from both entities on January 26, 2006. They claim he no longer had an ownership stake as of that time and was not entitled to share in distributions after his withdrawal. The defendants assert that pursuant to an unwritten agreement among the principals, Gordon was entitled to receive only the value of his capital account upon withdrawal, which they say was negative.

Whether Gordon could withdraw, whether he did so effectively, and what the implications of his withdrawal would be are matters determined by the agreements governing the Passive Manager and the Active Manager. The Passive Manager is a Delaware limited liability company, so the answer depends on its operating agreement. The Active Manager is a Delaware limited partnership, so the answer depends on its limited partnership agreement. An agreement may be "written, oral or implied." 6 *Del. C.* § 18-101(7) (including in the definition of operating agreement "any agreement . . . , written, oral or implied, of the member or members as to the affairs of a limited liability

14

company and the conduct of its business"); *id.* § 17-101(12) (same for partnership agreement). If there is no agreement, or if the agreement is silent, then the answer depends, respectively, on the default provisions of the Delaware Limited Liability Company Act (the "LLC Act") or the Delaware Limited Partnership Act (the "LP Act" and, together with the LLC Act, the "Acts"). *See* Robert L. Symonds, Jr. & Matthew J. O'Toole, *Delaware Limited Liability Companies* § 1.03[A][2], at 1-15 (2012 Supp.); Martin I. Lubaroff & Paul M. Altman, *Delaware Limited Partnerships* § 1.2, at 1-3 (2013 Supp.).

The default rule under the Acts is that in the absence of an agreement, a partner or member may not withdraw "prior to the dissolution and winding up" of the entity. 6 *Del. C.* § 18-603; *id.* § 17-603. Upon withdrawal, unless otherwise provided, a partner "is entitled to receive, within a reasonable time after withdrawal, the fair value of such partner's partnership interest in the limited partnership as of the date of withdrawal based upon such partner's right to share in distributions from the limited partnership." 6 *Del. C.* § 17-604; *accord id.* § 18-604 (same for resigning members of a limited liability company).

This decision has rejected as a factual matter the defendants' claim that Gordon relinquished his interest in the Active Manager in 2005. The defendants' position on that score depended on an unreasonable reading of a single email and an unpersuasive, retrospective re-imagining of Gordon's effort to minimize the partners' risk of attracting attention from the City of New York. Gordon continued to hold his interest in the Active Manager on January 26, 2006, when he resigned from Brownstone.

15

The defendants have advanced marginally more persuasive arguments about the existence of an unwritten agreement among the principals pursuant to which Gordon automatically would give up his interests in the Passive Manager and the Active Manager if he resigned from the Broker/Dealer. According to the defendants, the unwritten agreement called for Gordon to receive only the value of his capital account in each entity. This decision need not delve into the details of the purported agreement, because the evidence at trial established that on January 26, 2006, Gordon severed his relationship with his partners and the Brownstone financial services boutique. That definitive separation included withdrawing not only from the Broker/Dealer, but also from the Passive Manager and the Active Manager.

The existence of the purported unwritten agreement and its terms might matter if Gordon had introduced evidence at trial about the fair value of his interests in the Passive Manager and the Active Manager on the date of withdrawal. The defendants maintain that pursuant to the unwritten agreement, Gordon only was entitled to the value of his capital account. Under the statutory default rule that otherwise would apply, Gordon would be entitled to the fair value of his interests.

Because Gordon failed to introduce evidence of the fair value of his interests other than evidence sufficient to determine the value of his capital account, it is not possible to award him anything other than the value of his capital accounts. The outcome under the defendants' purported unwritten agreement is the same as the outcome under the statutory default rule that applies in the absence of the unwritten agreement.

This decision therefore proceeds as follows:  First, it explains why the trial record established that Gordon severed his relationship with his partners and the Brownstone financial services boutique on January 26, 2006, notwithstanding both sides' inconsistent positions on that issue; and second, it determines the value of Gordon's capital accounts in the Passive Manager and the Active Manager as of that date.

## A.      The Implied Agreement On Withdrawal

The critical factual issue in the case is whether Gordon withdrew from the Passive Manager and the Active Manager on January 26, 2006.  Gordon argues that (i) he did not withdraw from the Passive Manager and the Active Manager, (ii) to the extent he attempted to withdraw, his attempts were unsuccessful because they were contrary to the default provisions of the Acts, (iii) his attempts were unsuccessful because the parties never agreed on the amounts he was due for his interests, and (iv) to the extent the parties established by their conduct an implied agreement that he could withdraw, that agreement is invalid under the statute of frauds.

### 1.      The Events Of January 26, 2006

The evidence established that Gordon withdrew from the Passive Manager and the Active Manager on January 26, 2006.  Both sides have taken inconsistent positions on this issue.  Until this litigation, Gordon maintained that he could withdraw and did; he now says that he might have tried but failed in the attempt.  The defendants acted ambiguously early on, seemingly in an effort to obstruct whatever outcome Gordon wanted.  Now they maintain that Gordon could withdraw and did.

17

Although there was conflicting evidence at trial about what occurred on January 26, 2006, an objective viewer would regard Gordon as having severed all of his ties with the defendants and the Brownstone financial services boutique. He turned in his keys and took the dramatic step of cutting up his corporate charge card and building identification card. The other principals of the firm and its employees gathered together and said goodbye. He walked out the door, never to return. Effectuating a complete separation necessarily included withdrawing from all of the entities in which he was a member. Consistent with an effort to sever all ties, Gordon withdrew his personal funds that were invested in the Hedge Fund.

Gordon has claimed in this case that he intended to resign as an employee and to withdraw from the Broker/Dealer, but not to withdraw from the Passive Manager and the Active Manager. On January 26, 2006, Gordon understandably emphasized the most pressing and prominent issues: his status as an employee and his interest in the entity where he had the biggest stake. But the bottom line was that Gordon wanted to leave a business that was making him unhappy. Given his professed antipathy towards the business and his partners, it is not credible that he wanted to maintain a relationship with them through the Passive Manager and the Active Manager.

The record indicates that Gordon demanded a significant monetary payment for his interest in Brownstone. At trial, Gordon suggested that his demand focused on the Broker/Dealer and did not encompass the Passive Manager and the Active Manager, but he did not introduce his resignation letter, which might have provided more persuasive

18

evidence of so specific a demand. Given the context, it makes more sense that Gordon was demanding a substantial payment for his interests in all of the Brownstone entities.

Gordon's subsequent actions comported with his departure from Brownstone in all capacities, including his withdrawal from all of the Brownstone entities. After he left on January 26, 2006, Gordon did not ask for information about the Passive Manager or the Active Manager, nor did he inquire about distributions. He did not follow up with the defendants when he received a 2005 Schedule K-1 for the Passive Manager marked "Final." A year later, on January 25, 2007, he sent letters to the defendants seeking compensation for his interests in the Passive Manager and the Active Manager. When he filed his arbitration demand on February 15, 2008, he contended that he had withdrawn from the Broker/Dealer, the Passive Manager, and the Active Manager and sought compensation for the value of his equity interests in those entities. Only when he brought this litigation did Gordon advance the position that although he might have tried to withdraw, his attempts were ineffective.

The defendants' position about January 26, 2006, has been similarly inconsistent, but here too the evidence as a whole suggests that they believed Gordon had left. It is true that during the months immediately following Gordon's departure, they did not take any immediate action to confirm his withdrawal. Although they now claim he was not owed any capital, they did not send him a notice saying that. In February 2006, when testifying in the District Court Action, Lowey professed not to know whether Gordon had withdrawn. But soon thereafter, the defendants did take steps reflecting Gordon's withdrawal. Most notably, on June 5, 2006, they reported that Gordon was no longer a

19

partner in the Active Manager in a Form ADV filing. They also stopped making distributions to Gordon and providing him with information concerning the performance and profitability of the entities.

Unfortunately, the defendants muddied the waters in October 2006, when they prepared the erroneous Schedule K-1 for Gordon's interests in the Passive Manager and failed to send him final Schedule K-1s for any other entity. And on February 15, 2007, in response to Gordon's written demand for payment for his interests in the Passive Manager and the Active Manager, the defendants muddied the waters further. Rather than telling Gordon that he already withdrew a year before, they asked for additional information about Gordon's status and why Gordon he believed he could withdraw from the entities, if he was in fact a partner.

The parties have only themselves to blame for this factual murk. Having considered the evidence, this decision concludes that Gordon withdrew from all of the Brownstone entities, including the Passive Manager and the Active Manager, on January 26, 2006.

### 2. The Parties' Implied Agreement Controls.

Gordon next contends that even if he attempted to withdraw, his attempts were ineffective because the default provisions of the Acts do not permit a member or limited partner to withdraw before dissolution and winding up and the defendants failed to prove the existence of an unwritten agreement authorizing withdrawal. What the evidence instead established is that the parties agreed by their conduct that Gordon could and did withdraw. That "implied" agreement is permissible and effective under the Acts.

20

An agreement governing a limited liability company or a limited partnership may be written, oral or implied. 6 *Del. C.* § 18-101(7); *id.* § 17-101(12). An implied agreement "is one inferred from the conduct of the parties, though not expressed in words." *Capital Mgmt. Co. v. Brown*, 813 A.2d 1094, 1098 (Del. 2002). "Just as assent may be manifested by words, so intention to make a promise may be manifested in language or by implication from other circumstances." 1 *Williston on Contracts* § 1:5 (4th ed. 2014). "In determining whether the parties' conduct implies a contract in fact, their conduct is evaluated from the perspective of a reasonable person, considering all of the attendant circumstances . . . ." *Id.* A party's subjective intent or belief, does not determine whether an implied contract exists. The failure to object may be treated as acceptance. *See* Restatement (Second) of Contracts § 19(1) (1981) ("The manifestation of assent may be made wholly or partly by written or spoken words or by other acts or by failure to act."); *see also Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 582 (2d Cir. 2006) (finding that acceptance sufficient to form an implied contract may be inferred based upon failure to object to party's conduct).

In this case, the evidence established that Gordon withdrew from the entities on January 26, 2006. Through his conduct, he manifested an intent to withdraw, and through their conduct, the defendants manifested their acceptance of his withdrawal. Their implied agreement that Gordon had withdrawn modified the default provisions in the Acts that otherwise prevent a limited partner or member from withdrawing before dissolution and winding up.

### 3. The Failure To Agree Upon Payment

Gordon next contends that assuming he tried to withdraw, his withdrawal was ineffective because he and the defendants never reached agreement on the fair value of his interests. The parties' implied agreement did not encompass a requirement that Gordon and the defendants first agree on the amount he would be paid. The Acts create a baseline expectation in which the ability of a member or partner to withdraw is distinct from the question of what the departing member or partner would receive in compensation. *Compare* 6 *Del. C.* § 18-603 (resignation of member), *and id.* § 17-603 (withdrawal of limited partner), *with id.* § 18-604 (distribution upon resignation), *and id.* § 17-604 (distribution upon withdrawal).

The record indicates that Gordon recognized that distinction. He testified that in his resignation letter, he demanded compensation for his interests in Brownstone, notwithstanding that he was walking out that day. When he filed his arbitration demand on February 15, 2008, he contended that he already had withdrawn from the Broker/Dealer, the Passive Manager, and the Active Manager and was entitled to compensation for the value of his equity interests. He did not claim that he was still a member and limited partner of those entities.

### 4. The Statute Of Frauds

Gordon also contends that to the extent an implied agreement regarding his withdrawal existed, its effectiveness is barred by Delaware's statute of frauds because it would be impossible to calculate the value of his interests within a year. Gordon argues that amendments to the Acts in 2010, which exempted operating and partnership

22

agreements from the statute of frauds, do not apply retroactively. *See* 6 *Del. C.* § 18-101(7) (amended in 2010 to exempt operating agreements from the statute of frauds); *id.* § 17-101(12) (same for partnership agreements).

This court need not reach the question of whether the amendments in 2010 were intended to be retroactive because the implied agreement would not be barred by the statute of frauds in any event. Delaware's statute of frauds bars the enforcement of an agreement that is not to be performed within the space of a one year from its making, unless it is (i) written and (ii) signed by the party against whom the agreement is to be enforced. 6 *Del. C.* § 2714(a). "[T]he Statute of Frauds does not apply to a contract which may, by any possibility, be performed within a year." *Haveg Corp. v. Guyer*, 211 A.2d 910, 912 (Del. 1965). The act of withdrawing was certainly capable of being performed within one year because it could be completed in a single day. Gordon performed *and completed* it on January 26, 2006. The payment of whatever compensation Gordon was due also could have been completed within one year. If the defendants had wanted, they could have asked their accountants or hired valuation professionals to make the necessary calculations promptly after January 26. The statute of frauds therefore would not invalidate the parties' implied agreement on Gordon's withdrawal, even if Gordon is right that the 2010 amendments did not operate retroactively.

## B.    Gordon's Remedy

Because Gordon held interests in the Passive Manager and the Active Manager through January 26, 2006, he is entitled to his proportionate share of the distributions

23

made by those entities before his withdrawal. By statute, he became entitled upon his withdrawal to the fair value of his interests in those entities. The statutory calculation is not limited to the value of his capital account, but rather should represent "the fair value of [the interest] as of the date of withdrawal based upon [the] partner's right to share in distributions from the [entity]." 6 *Del. C.* § 17-604 (limited partnership); *accord id.* § 18-604 (same for resigning members of a limited liability company). Gordon did not present any evidence of the fair value of his interests as of that date. He therefore failed to meet his burden of proof and is not entitled to any amounts beyond the value of his capital accounts.

For the Passive Manager, Gordon should have had a balance in his capital account of $15,987.80 as of the end of 2005, taking into account the $3,284.00 distribution he received in April 2005. The Passive Manager generated total income of $1,022,238 in 2006. Gordon is entitled to 5% of the 2006 income generated during the 26 days that he held his interest during that year. Using the simplifying assumption that income was steady over the course of the year, he is entitled to $3,641.85.

For the Active Manager, Gordon should have had a balance in his capital account of $14,854.90 at the end of 2005, taking into account the $10,000.00 distribution he received in April 2005, his $500.00 capital contribution, and his 5% share of the total income generated that year. In 2006, the Active Manager generated total income of $156,983. Gordon is entitled to $559.12 for the 26 days that he held his interest in the Active Manager that year.

24

## III. CONCLUSION

Gordon withdrew from the Passive Manager and the Active Manager on January 26, 2006. He is entitled to the $35,042.67, plus pre- and post- judgment interest from January 26, 2006, until the date of payment. Interest is set at the statutory rate, compounded quarterly. Each side will bear its own costs. The parties will submit a form of Order and Final Judgment to implement this decision.